Filed 6/30/16  A.M. v. Superior Court CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| A. M.,<br><br>                Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES,<br><br>                Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>              Real Party in Interest. | B270915<br><br>(Los Angeles County<br> Super. Ct. No. DK01287) |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Michael Miller, Judge.  Petition denied.

Los Angeles Dependency Lawyers, Inc., Law Office of Marlene Furth, Jody Marksamer and Monique Stevens, for Petitioner.

No appearance for Respondent.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Real Party in Interest.

_____

## INTRODUCTION

Petitioner is the father of four-year-old S.M., a dependent of the juvenile court. He has filed a petition for extraordinary writ pursuant to rule 8.452 of the California Rules of Court challenging the juvenile court's March 7, 2016 order terminating his reunification services and setting a hearing under Welfare and Institutions Code section 366.26.[1] We conclude there is substantial evidence supporting the juvenile court's decision that return of S.M. to father's custody would create a substantial risk of detriment. We therefore deny the petition.

## PROCEDURAL BACKGROUND AND FACTS

Father and the Los Angeles County Department of Children and Family Services (DCFS) set out in their papers the complete history of the lengthy juvenile court proceedings in this case. Repetition is not required except when necessary to address the specific claims for extraordinary relief.

### A.      *Petition and Jurisdiction*

Father A.M. and mother M.C. are the parents of S.M., born in September 2011.[2] On September 23, 2013, DCFS filed a petition pursuant to section 300 alleging S.M. needed the protection of the juvenile court.

S.M. was living with his mother when DCFS received a referral alleging general neglect because of mother's marijuana use. When the social worker interviewed mother, she reported that father resided in Palmdale. She thought he might be in jail. Mother had no contact information for father.

On a follow-up visit, mother told the social worker that father had threatened her. Father called and told mother he hoped she would die so he could get S.M. Father's girlfriend also threated to kill both mother and S.M. On May 31, 2013, while father was visiting with S.M., he lunged at mother and choked her, leaving a red scratch on her neck.

---

[1]      All further statutory references are to the Welfare and Institutions Code.

[2]      Mother is not a party in this writ proceeding.

She said father had harmed her before. Mother told the social worker she was planning on getting a restraining order.

DCFS received another referral alleging that both mother and the maternal grandfather, with whom she lived, were heavy drinkers. When the social worker investigated that referral on June 20, 2013, she discovered that mother had not followed up on obtaining a restraining order against father. The maternal grandfather reported to the social worker that father and mother had a history of domestic violence, and that one time father gave mother two black eyes. Father had not had any contact with S.M. lately.

On July 1, 2013, the social worker responded to mother's third child abuse referral. As a result, DCFS held a Team Decision Making Meeting on July 11, 2013, and agreed to offer mother services. DCFS contacted father on September 12, 2013. He reported mother was pregnant with another man's child. He denied any alcohol or drug use, and agreed to test for drugs. Father admitted he committed domestic violence, but said that was two months earlier and that mother threw a toy at him. When father tested for drugs, he tested positive for opiates and hydrocodone. He claimed he was taking Vicodin for a toothache.

DCFS detained S.M. on September 18, 2013. DCFS reported that mother said father was violent with her. She said the second time he hit her, she hit him back. She also said he was emotionally, physically, and financially abusive. Father denied he had a violent altercation with mother, and said she was bipolar and had "ADHD." He also accused mother of once trying to cut him with a filet knife.

In a later addendum report, with a letter from the maternal grandmother, she wrote that during the time mother was in a relationship with father, mother suffered a broken wrist, two black eyes, and a bruised face. She said that she had witnessed father under the influence of marijuana, and that he tried to sell marijuana to one of the maternal grandfather's employees. She criticized father's care for S.M., stating that he would tell S.M. to stop crying, and threatened to put him in his crib all day if he did not stop crying. DCFS also provided a police report detailing a June 30, 2013, incident of domestic

violence during which father choked and kicked mother. The police documented an approximate four-inch abrasion on the right side of mother's neck.

On January 9, 2014, the juvenile court sustained an amended section 300 petition and granted both parents reunification services.[3] Father was ordered to complete a 52-week certified domestic violence program, and complete a parenting program for toddlers. The court also ordered father to submit to random and on-demand testing, and if he missed a test or if a test was positive for drugs, he was to complete a full drug rehabilitation program. His visitation with S.M. was ordered to remain monitored, but DCFS could liberalize his visits.

## B. Six-Month Review Hearing

For the six-month review hearing, DCFS reported father had started a parenting class and had completed 16 two-hour classes. In addition, he was enrolled in domestic violence education classes and had attended seven classes.

On July 10, 2014, the juvenile court granted DCFS discretion to further liberalize father's visits, and DCFS was to determine whether father should have an extended summer visit.

## C. Father's Section 388 Petition

On August 19, 2014, father filed a section 388 petition requesting that S.M. be placed in his custody because he had completed his domestic violence program and

---

[3]   The sustained petition alleged the following, as it pertains to father: "The child [S.M.'s] mother, [M.C.] and father [A.M.], have a history of engaging in violent altercations. On May 31, 2013, the father lunged at the mother and choked mother inflicting a scratch and redness to the mother's neck in the child's presence. On March 20, 2013, the mother and father struck each other. Such violent conduct on the part of the parents endangers the child's physical health and safety and places the child at risk of physical harm, damage, and danger.
        "[¶] . . . [¶]
        "The child [S.M.] father, Anthony [M.] has a history of substance abuse and is a current abuser of opiates which renders the father incapable of providing regular care of the child. On September 13, 2013, the father had a positive toxicology screen for opiates and hydrocodone. The father has a criminal history of a conviction of possession of marijuana. The father's substance abuse endangers the child's physical health and safety and places the child at risk of physical and emotional harm and damage."

4

parenting classes, and also because he had been having unmonitored weekend visits since July 10, 2014.

In DCFS's report for the section 388 hearing ordered by the court, it stated that father had only appeared for four drug tests, and had missed six tests. Father was in partial compliance based on his failure to drug test regularly and also because he had completed a 24-week domestic violence program but was ordered to complete a 52-week domestic violence program. Nonetheless, in a supplemental report, DCFS recommended that S.M. be placed in father's care if he agreed to family preservation services, due to his partial compliance and the fact that he had never before cared for S.M. on a full-time basis. Father declined, stating he did not want service providers in his home. He later changed his mind and agreed to consent to such services. The juvenile court followed DCFS's recommendation, and placed S.M. in father's home on October 20, 2014.

## D.     *The Section 387 Supplemental Petition*

DCFS detained S.M. from father on March 11, 2015, and filed a section 387 petition indicating S.M. was not safe in father's custody. On March 11, 2015, DCFS had received a call from the Hawthorne Police Department alleging domestic violence. The police indicated that when they arrived at father's home they heard arguing and banging. An officer knocked on the door, but no one answered. After they opened a window, father's girlfriend came to the door. Father and his girlfriend were arrested for endangering a child. (Pen. Code, § 273a, subd. (b).)

The police determined S.M. was endangered because father and his girlfriend were engaged in a heated verbal argument, and they refused to open the door for the police. The police asked S.M. if father and his girlfriend were arguing, and he stated that they were. The police also reported that the apartment was unorganized and appeared to be ransacked. Father had an outstanding traffic warrant from San Bernardino County with bail set at $100,000, and was taken into custody. The juvenile court removed S.M. from father's care and placed S.M. with the maternal grandparents.

Father and his girlfriend denied the allegations of domestic violence. But after conducting an investigation, DCFS recommended to the juvenile court that it terminate

family reunification services and set the case for a selection and implementation hearing under section 366.26.

On April 20, 2015, father pled no contest to an amended section 387 petition, which alleged on-going domestic disputes between father and his girlfriend in front of S.M., thus endangering his physical safety and placing him in risk of harm. The juvenile court granted father additional reunification services, and he was ordered to submit to weekly random drug tests. He was also ordered to participate in anger management and healthy relationship and parenting choices. The court set a section 366.22 hearing in six months and a progress hearing to address liberalization of father's visits for June 2, 2015.

## E.    Interim Status Reports

DCFS's June 1, 2015 interim review report indicated father had had no visits with S.M. Father explained he was completing 45 days of community service, which interfered with his ability to comply with his case plan.

DCFS's six-month status review report indicated father had four monitored visits with S.M., but he had not participated in any additional services, and continued to reside with his girlfriend. Therefore, DCFS recommended that the juvenile court terminate family reunification services.

Father later submitted a letter from Eldorado Community Service Centers, dated November 17, 2015, indicating he had completed three counseling sessions addressing interpersonal conflict resolution and problems concerning his significant other and individuals he encounters in the community. On November 18, 2015, the court liberalized father's visits to unmonitored visits in a public setting, with father not being allowed to bring others.

## F.    The Section 366.22 Hearing

In advance of the section 366.22 hearing, DCFS submitted a report with updated information on father's compliance. The social worker reported father had completed eight counseling sessions, focusing on stress management and relationship issues with his significant other and S.M. DCFS reported that from October 5, 2015, through January 7, 2016, father was scheduled for nine drug tests. He tested negative for two of the tests but

failed to appear for the seven other tests. Father had two unmonitored visits with S.M. DCFS continued to recommend that reunification services be terminated.

At the hearing, counsel for DCFS argued father had not been in compliance with the case plan because he had failed to show for numerous drug tests, had only completed eight counseling sessions, he continued to live with his girlfriend, with whom he has a history of domestic violence, and his unmonitored visits with S.M. were very recent. Counsel for father argued S.M. should be returned to his care because he was in substantial compliance with the case plan and the issue that brought the section 387 petition to the court–domestic violence–had been resolved. S.M.'s counsel also argued father was in substantial compliance with the case plan.

After much discussion by the court and counsel, the court said, "My issue is, is that I'm wrestling. I'm struggling. Because both sides have [made] good points. I just don't want to make a hasty decision. I have a gut feeling. I don't want to make a hasty decision. . . . [¶] This is an important[,] serious issue."

When the hearing resumed about a month later, the juvenile court indicated that it wanted to continue the matter and wanted three clean drug tests from father. Father asked why, and the court said, "Because I said so." Father then interrupted and proceeded to criticize the court, saying there was no reason for him to be tested for drugs. He said, "You are playing games, sir. This all is a game. You are playing games with my son right now. I am trying to get my son back. And you have no reason to hold my son for nothing. You don't have no case. So why are we still sitting here? Just talking for what? What are we waiting on? What we wasting time for? Why are you doing another day for? For what? It's not going to change nothin. My son is still going to be in the same situation he in. . . . [¶] Ain't nothing going to change, man. Come on, now. Three drug tests. Come on, now. . . . [¶] You are playing games. You are playing with humans here, man."

As the juvenile court began rendering its decision, father continued to interrupt: "I'm going to appeal. Straight up. I am going to appeal. . . . This is drama, man. This is Romper Room right here, man. This is Romper Room. Why -- " The court interrupted,

saying: "Can I finish or do you want to – do you want the floor?" Father responded, "Man, I need the floor, man. I need to speak my peace, sir."

The court indicated father would have to leave if he kept disrupting the court, and then gave its ruling, while father kept interrupting: "[Father] was ordered on April 20, 2015, to do drug and alcohol services consisting of random or on-demand drug and alcohol testing weekly, transportation assistance, and individual counseling to address anger management and healthy relationships and parenting choices. [¶] [Father] has participated in individual counseling. However, he has not performed any drug tests from October 5, 2015, through January 7, 2016. Actually, strike that. He has two negatives on 12-11 and 10-8."

The juvenile court terminated father's reunification services and ordered DCFS to initiate an adoptive home study. Father challenges this decision.

## DISCUSSION

Father contends the juvenile court erred in terminating reunification services because there is no substantial evidence supporting a finding that S.M. would be at substantial risk of detriment if returned to him. We disagree.

Typically, when a child is removed from a parent, the child and parent are entitled to 12 months of child welfare services in order to facilitate family reunification services, which may be extended to a maximum of 18 months. (§ 361.5, subds. (a)(1)(A) & (a)(3).)

Section 366.22, provides that within 18 months after a dependent child was originally removed from the physical custody of his parent, a permanency review hearing must occur to review the child's status. At the hearing, "[t]he court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).)

The juvenile court's determination is reviewed for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) "Substantial evidence"

means such evidence as a reasonable mind might accept as adequate to support a conclusion. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) In reviewing the evidence, we must construe it in the light most favorable to the juvenile court's determination, resolve all conflicts in support of the court's determination, and indulge all inferences to uphold the court's order. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1020-1021; *In re Michael G.* (1993) 19 Cal.App.4th 1674, 1676; *In re Rocco M.*, *supra*, at p. 820.)

The mere completion of the technical requirements of the reunification plan is not the sole consideration when deciding whether to return the child to the parent. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 (*Constance K.*); *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1140.) "At the section 366.22 hearing, a trial judge can consider, among other things: whether changing custody will be detrimental because severing a positive loving relationship with the foster family will cause serious, long-term emotional harm . . . ; whether the natural parent maintains relationships with persons whose presence will be detrimental to the [child] . . . ; limited awareness by a parent of the emotional and physical needs of a child . . . ; failure of a minor to have lived with the natural parent for long periods of time . . . ; and the manner in which the parent has conducted himself or herself in relation to a minor in the past." (*Constance K.*, *supra*, at pp. 704-705, citations omitted.)

Also, the detriment justifying continued removal need not be the same as the initial detriment. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) The focus of the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child at the time of the review hearing. (*Ibid.*) "[I]f returning the child will create a substantial risk of detriment to his or her physical or emotional well-being [citations], placement must continue regardless of whether that detriment mirrors the harm which had required the child's removal from parental custody." (*Id.* at p. 900.)

First, father did not comply with the court ordered drug testing program. On January 9, 2014, the juvenile court found that father had a history of substance abuse

and was a current abuser of opiates, and had a criminal history involving marijuana possession. The court found this history and substance abuse rendered father incapable of providing regular care for S.M., endangered his physical harm and safety, and placed him at risk of physical and emotional harm. As a result, the juvenile court ordered father to submit to random and on-demand testing, and if he missed a test or if a test was positive for drugs, he was to complete a full drug rehabilitation program. Similarly, after DCFS was forced to file a section 387 petition due to father once again endangering S.M.'s safety while in his custody, the juvenile court on April 20, 2015, gave father another chance by allowing further additional reunification services, but once again ordered that he submit to regular random drug testing.

Father failed to substantially comply with the ordered drug-testing program. From May 11, 2015, to September 22, 2015, father failed to show up for five of the six drug tests. From October 5, 2015, through January 7, 2016, father was scheduled for nine drug tests. He tested negative for two of the tests but failed to appear for the seven other tests.[4] That's a failure rate of 80 percent. The record before this court bears out that in the end the juvenile court was struggling to make an appropriate decision. The court no doubt recognized some of the gains father had made, but also had a concern about father's persistent failure to take drug testing seriously. As a result, the court was willing to give father additional time and asked that he continue drug testing and provide three negative tests. Not only did father outright refuse the court's request, but he proceeded at length to criticize and disrespect the court. It was reasonable for the court to infer that father's resistance to drug testing could be an attempt to conceal drug usage. Father's failure to comply with drug testing is substantial evidence supporting the trial court's decision as to S.M.'s risk of detriment.

Second, father's second incident of domestic violence coupled with his courtroom outburst indicated father had not eliminated the substantial risk of harm to S.M.

---

**4** Father's performance was similarly inadequate before the adjudication of the section 387 petition. Out of the 24 drug tests scheduled between June 13, 2014, and April 17, 2015, father did not bother to show up for 15 of the drug tests.

On January 9, 2014, the juvenile court found that father had engaged in two separate incidents of domestic violence with S.M.'s mother. Then about a year later, the court once again found father and now his girlfriend were engaged in on-going domestic disputes requiring intervention by police. Because of the second petition, on April 20, 2015, father was granted additional reunification services, and the court ordered a new case plan. In addition to the drug testing already discussed, the case plan ordered counseling to address anger management and healthy relationship and parenting issues. In spite of being granted additional time to reunify, by October 2015 father had not participated for a least six months in any of the ordered services. He only began counseling after the contested section 366.22 hearing was set on October 20, 2015.

Due to the fact the juvenile court continued the contested section 366.22 hearing more than once, father was able to complete the required 10 counseling sessions. But father's conduct in the courtroom indicated to the juvenile court that he was still not able to control himself. The court simply ordered three additional negative drug tests, which was reasonable given father's dismal record of drug testing. Father went on the attack, accusing the court of being a "Romper Room" and "playing games." From this uncontrolled outburst, the juvenile court could reasonably infer that in spite of father's recent counseling sessions he could not handle his frustration in an appropriate manner or control himself. Given this outburst and the repeated incidents of domestic violence, the court did not err in finding that returning S.M. to father at that point in time would place him at a substantial risk of detriment.

## DISPOSITION

The petition is denied. This opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A) of the California Rules of Court.


                                                      BIGELOW, P.J.

We Concur:


        RUBIN, J.                    GRIMES, J.


11